JULIO DE JESÚS y CARMEN MARÍA VÁZQUEZ, demandantes y recurridos, *v.* PONCE HOUSING CORP. y SABANA GRANDE DEV. CORPORATION, demandados y recurrentes; SOCIEDAD LEGAL DE GANANCIALES DE GILBERTO IRIZARRY PAGÁN y LUZ AIDA RAMÍREZ DE IRIZARRY, demandantes y recurridos, *v.* PONCE HOUSING CORP. y SABANA GRANDE DEV. CORP., demandados y recurrentes.

*Número:* R-74-374     *Resuelto:* 28 de mayo de 1976

*Wilfredo Colón Pagán,* abogado de los recurrentes; el abogado de los recurridos no compareció.

El Juez Asociado Señor Díaz Cruz emitió la opinión del Tribunal.

La corporación constructora de la urbanización Perla del Sur, Extensión III, en Ponce, entregó las casas núms. C-343 y C-344 que fueron vendidas entre fines de 1964 y principios de 1965. Al construirse la Avenida Las Américas uno o dos años después dichas casas quedaron a un nivel apreciablemente más alto que el de la avenida. Desde que fue abierta al tránsito la Avenida Las Américas, de Ponce, se inunda con las lluvias acumulándose agua especialmente en las inmediaciones de las referidas casas C-343 y C-344. A los tres años de construidas, allá para el 1968, ambas casas empiezan a hundirse del mismo lado izquierdo mirando de frente, y como consecuencia surgieron desperfectos graves tales como grietas en las paredes y techo, bloqueo de todas las instalaciones donde se usa agua, baranda del balcón que se separa de la casa, puertas que tropiezan con sus marcos, siendo la inclinación de 17 pulgadas en una de las unidades, condición que llevó al juez sentenciador a concluir que no hay más recurso para corregirla que demoler totalmente las dos, nivelar el terreno y levantar nuevas estructuras. Condenó a la constructora recurrente a indemnizar en $11,000 los sufrimientos morales de los dueños de casa ($7,000 a los Irizarry, y $4,000 a los De Jesús); y a pagar además $700 costo de un estudio de ingeniería que contrató uno de ellos y $4,000 de honorarios de abogado. La sentencia impone a las recurrentes la obligación de demoler las estructuras inclinadas, nivelar el terreno, y construir y entregar a los demandantes dos unidades de vivienda nuevas iguales a las existentes, fijando para ello plazo de un año, y las obligaciones incidentales de pagar gastos de mudanza a los esposos Irizarry y la renta de una vivienda

temporera similar, y en cuanto a éstos y los actores De Jesús a pagar los plazos mensuales de la hipoteca que afecta cada una de las viviendas, hasta que les entregue las nuevas.

La sentencia se ajusta a derecho en cuanto impone responsabilidad al contratista pero excede la medida compensatoria. La prueba acusa como razón de la ruina de estos edificios el desplazamiento y hundimiento del suelo. Hay que buscar la explicación para esta anormalidad en los detalles objetivos que apuntan en la evidencia pericial, oral y documental tomada en conjunto. (¹)

■ Tanto el informe del perito judicial Martínez Riollano como el estudio de suelo para construcción hecho por el Ing.

_____

(¹) Sostiene sobre el particular el informe del perito judicial:

"1. El terreno en su origen era uno de los más bajos de Ponce, sujeto a inundaciones constantes.

"2. La evidencia de lo sucedido en el 'BY–PASS', al Sur y LA AVE-NIDA 'LAS AMERICAS', al NORTE, demuestran que el subsuelo es inestable.

"3. Hay evidencia física de que el terreno RELLENADO ha cedido en varios sectores y tal condición puede deberse a uno de los siguientes factores PRINCIPALES:

"A. No se compactó debidamente en capas finas con relleno adecuado.

"B. De haberse compactado EFICIENTEMENTE, las condiciones del SUB–SUELO no se normalizaron y el peso ADICIONAL de RELLENO y ESTRUCTURAS, provocaron deslizamientos sub-terráneos; derrotándose así el propósito del relleno y su compactación.

"C. Las lluvias e inundaciones, pudieron afectar las capas débiles del sub-suelo, desplazándose o deslizándose hacia el PUNTO más débil— en la COLECTORA que cruza el área de SUR A NORTE. (En colindancia Oeste de la Urbanización.)

"4. Las inundaciones continuas, como ya establecimos, pudieron afectar el área, pero su daño no ha sido en la superficie PROPIAMENTE, sino en el sub-suelo.

"5. Las condiciones observadas en el área y sus alrededores, tienden a demostrar que el sub-suelo es INESTABLE y que muy bien podría existir un RIO SUB-TERRANEO o una VENA que cruza, en forma irregular todo el área de NORTE a Sur.

"6. El remedio, en casos como éstos, (HINCA DE PILOTES, DRENAJES CON TUBERIA O PILOTES DE ARENA), hubiera sido tan costoso que no hubiera sido económicamente factible para el tipo de

Rodríguez Molinary en 1959 coincidieron en que el área de la Sección IV de la Urbanización Perla del Sur es inundable y que el subsuelo es blando, de arcilla cenagosa, susceptible a ceder bajo el peso de un relleno bien compactado más la estructura, lo que tiende a producir desplazamientos o deslizamientos que alteran el nivel en la superficie con las consecuencias denunciadas en las casas de los demandantes. Para tal caso los peritos recomiendan el fortalecimiento del subsuelo con hinca de pilotes o zapatas especiales, procedimiento costoso que inevitablemente haría subir el precio de venta de las casas. No surge de la prueba que las recurrentes siguieran ese método científico para asegurar la solidez y firmeza del suelo, por lo que están sujetas a la responsabilidad impuesta en el Art. 1483 del Código Civil (31 L.P.R.A. sec. 4124). *Géigel* v. *Mariani,* 85 D.P.R. 46 (1962). ([2])

A tenor del citado Art. 1483 el contratista y el arquitecto que dirigiere la obra "responden de los daños y perjuicios". Este Tribunal ha concretado ese concepto de daños, en casos de vicio o ruina corregible de la estructura, para incluir no sólo la obligación de reparar los defectos, sino

---

estructuras allí construidas. Tales costos se justificarían en estructuras de varios pisos. Otros remedios más simples, como cimientos flotantes etc. quizás hubieran sido aceptables.

• • • • • • • •

"A. Toda la evidencia tiende a demostrar que el DESNIVEL de las casas se debe a una falla del terreno. (Ya sea por falta de compactación del relleno, por relleno inadecuado, o por falla del subsuelo.) Las inundaciones pudieron afectar el subsuelo, (siendo causa indirecta de la falla), pero no se nos ha presentado evidencia de que se tomaron las precauciones necesarias, (mediante estudios de subsuelo), para diseñar una cimentación capaz de sostener la carga, independientemente de las condiciones subterráneas que pudieran existir." Informe del Ing. J. E. Martínez Riollano (23 abril 1970), págs. 7 y 19–20.

([2]) El arquitecto no se libra de responsabilidad si la causa de la ruina es el vicio del suelo, aunque demuestre que dio oportuno aviso de ese vicio al propietario, pues su deber en tal caso no es seguir las indicaciones de éste, sino resistirse a hacer la obra. El interés público así lo exige. Manresa, *Comentarios al Código Civil Español,* Tomo X, Vol. II, Ed. 1969, págs. 711–712.

también la de indemnizar por los daños morales previsibles. *Pereira* v. *I.B.E.C.*, 95 D.P.R. 28, 60-61 (1967).

Al incorporar a nuestro acervo jurídico este importante remedio social en protección de los adquirentes de viviendas, lo hicimos bajo la égida de moderación y prudencia que tomó cuerpo en la siguiente advertencia: "Ahora bien, vale dejar sentado que al compensar por daños morales en esta clase de acciones los jueces deben ponderar cuidadosamente la concesión de éstos, limitándola a aquellos casos en que las condiciones de la construcción haya afectado en forma apreciable el estado emocional del reclamante. No todo vicio de construcción que dé derecho a que el constructor repare conlleva la concesión de daños morales. Los vicios deben ser de tal naturaleza que afecten la condición anímica de una persona." *Pereira* v. *I.B.E.C.* (En Reconsideración 95 D.P.R. 82, 83 (1967)).

■ La ruina de las casas de los recurridos frustra todo intento de reparación, como así ha concluido la sala de instancia. Cuando la estructura arruinada tiene vicios y defectos de tal magnitud que no dejan margen para su corrección y la restitución del edificio a condiciones de habitabilidad, la medida de los daños materiales reconocidos en el Art. 1483 debe seguir la pauta económica provista por el Código Civil para resolución de las obligaciones,(³) debiendo

---

(³) Art. 1395.—"La venta se resuelve por las mismas causas que todas las obligaciones."

Art. 1077.—"La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe."

"El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible."

Art. 1243, 5°.—"Son rescindibles: Cualesquiera otros [contratos] en que especialmente lo determine la ley."

Art. 1375.—"En los casos de las dos secciones anteriores [que norman el saneamiento por defectos o gravámenes ocultos], el comprador podrá

el contratista pagar al dueño de casa el importe íntegro de su inversión y gastos en el inmueble arruinado, con abono de intereses al tipo legal y liberarlo de toda obligación hipotecaria constituida o asumida por el comprador para financiar el precio de la vivienda. (⁴) En acción recíproca, el comprador dueño de casa devolverá a la constructora título de propiedad sobre el inmueble, libre de todo otro gravamen que no sea el constituido en garantía del precio.

■ Los recurridos de Jesús-Vázquez nunca vivieron la casa por él adquirida en 1964, la que decidieron no ocupar hasta añadirle una segunda planta (T.E. pág. 44), por lo que no se justifica la concesión a ellos de daños morales. *Díaz* v. *Palmer*, 62 D.P.R. 111 (1943). Su reclamación por tales daños no ha sido substanciada por prueba que satisfaga la norma de *Pereira* v. *I.B.E.C.*, supra. Ha de eliminarse la partida de $4,000 a ellos concedida por dicho concepto

---

optar entre desistir del contrato, abonándosele los gastos que pagó o rebajar una cantidad proporcional del precio, a juicio de peritos."

"Si el vendedor conocía los vicios o defectos ocultos de la cosa vendida y no los manifestó al comprador, tendrá éste la misma opción y además se le indemnizará de los daños y perjuicios, si optare por la rescisión."

Art. 1376.—"Si la cosa vendida se perdiere por efecto de los vicios ocultos, conociéndolos el vendedor, sufrirá éste la pérdida, y deberá restituir el precio y abonar los gastos del contrato, con los daños y perjuicios. Si no los conocía debe sólo restituir el precio y abonar los gastos del contrato que hubiese pagado el comprador."

Art. 1247.—"La rescisión obliga a la devolución de las cosas que fueron objeto del contrato con sus frutos y del precio con sus intereses; en consecuencia sólo podrá llevarse a efecto cuando el que la haya pretendido pueda devolver aquello a que por su parte estuviese obligado . . . ."

(⁴)"En la justicia conmutativa el fin de la indemnización, que es tanto como reparación o compensación, es el de conseguir que el patrimonio del lesionado quede por efecto de la indemnización, y a costa del responsable del daño, en situación igual o equivalente al que tenía antes de haber sufrido el daño, por lo que habiendo pagado el comprador por la finca un precio fijado como su equivalente, libre de todo gravamen [carga o servidumbre no aparente] la reparación o compensación adecuada sería la liberación del gravamen, si fuese posible, a costa o por acto de los vendedores responsables." (S. de 8 oct. 1949); Bonet Ramón, *Código Civil Comentado*, Segunda Edición, 1964, pág. 1164.

y reducir de $2,000 a $1,000 la partida de honorarios. Se revocará la disposición del tribunal a quo, ordenando a los recurrentes demoler las casas y construir nuevas para entregarlas a los recurridos y las medidas accesorias de mantenimiento interino de hipotecas y rentas, así como todo otro elemento de compensación de daños materiales incompatible con lo ahora resuelto en revisión.

Se devolverá el caso al Tribunal Superior para el cómputo y liquidación de la inversión de los demandantes-recurridos e intereses que ha de abonarles la constructora recurrente y para ulteriores procedimientos consistentes con esta opinión.

*Así fundamentalmente modificada, la sentencia recurrida será en cuanto a sus restantes pronunciamientos, confirmada.*

El Juez Presidente Señor Trías Monge disintió. Los Jueces Asociados Señores Rigau e Irizarry Yunqué no intervinieron.