ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
OATA-2023-131[1]

| | | |
|---|---|---|
| NILDA CORTÉS RIVERA Demandante-Apelante<br><br>v.<br><br>BENJAMÍN COLÓN BENÍTEZ, IVETTE RIVERA ROLÓN y LA SOCIEDAD LEGAL DE GANANCIALES POR ELLOS COMPUESTA Demandados-Apelados<br>------------------------------<br>NILDA CORTÉS RIVERA Demandante-Apelada<br><br>v.<br><br>BENJAMÍN COLÓN BENÍTEZ, IVETTE RIVERA ROLÓN y LA SOCIEDAD LEGAL DE GANANCIALES POR ELLOS COMPUESTA Demandados-Apelantes | KLAN202300282<br><br>CONS.<br><br>KLAN202300288 | Apelación procedente del Tribunal de Primera Instancia Sala de Aibonito<br><br>*Caso Núm.* AI2019CV00264<br><br>Sobre:<br><br>Incumplimiento de Contrato, Daños y Perjuicios |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Jueza Martínez Cordero y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 23 de agosto de 2024.

El 10 de abril de 2023, la señora Nilda Cortés Rivera (en adelante "señora Cortés Rivera") presentó un recurso de apelación, el cual se identificó con el alfanumérico KLAN202300282. El 10 de abril de 2023, Benjamín Colón Benítez, Ivette Rivera Colón y la Sociedad Legal de Gananciales compuesta por ambos (en adelante, "el matrimonio Colón Rivera o el contratista Colón Benítez") presentaron un recurso de apelación, el cual se identificó con el alfanumérico KLAN202300288. En el primer recurso, KLAN202300282, se solicita la modificación de la *Sentencia* emitida

---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución del Juez Nery E. Adames Soto.

el 20 de febrero de 2023 y notificada el 23 de febrero del mismo año; mientras que, en el KLAN202300288, se solicita la revocación de la misma. Mediante esta, el Tribunal de Primera Instancia, Sala Superior de Aibonito, declaró *Ha Lugar* la demanda presentada, concediendo la cantidad de $45,000.00 por daños ocasionados a la propiedad de la parte demandante y $15,000.00 por concepto de sufrimientos, angustias mentales y daños morales ocasionados a la demandante Nilda Cortés Rivera.

De una revisión integral de la *Sentencia* emitida, no se desprendía el desglose de las partidas concedidas a la señora Cortés Rivera, por lo que nos encontrábamos impedidos de revisar las mismas. Atendido el recurso, el 25 de junio de 2024, emitimos una *Resolución* conforme a la Regla 83.1 de nuestro Reglamento ordenándole al juez que presidía el presente caso ante el TPI, que fundamentara la referida *Sentencia* recurrida en cuanto al desglose detallado de los daños y explicara el cómputo y raciocinio utilizado para adjudicar los daños concedidos a la señora Cortés Rivera en el caso que nos ocupa. Eventualmente, el 16 de julio de 2024, emitimos una segunda *Resolución,* toda vez que, el foro de instancia no había cumplido con lo ordenado. En cumplimiento con nuestra orden, el 23 de julio de 2024, el Hon. Juez Carlo Ríos presentó un documento intitulado *Comparecencia Especial,* en el que procedió a desglosar el cálculo matemático que se utilizó para llegar a las cuantías actualizadas que finalmente se usaron para su adjudicación.

Luego de examinados los expedientes y la posición de las partes, por los fundamentos que exponemos a continuación, *se confirma* la *Sentencia* apelada.

**-I-**

Allá para el 29 de abril de 2009, la señora Cortés Rivera pactó con el señor Colón Benítez, la construcción de la propiedad de la

señora Cortés Rivera en la Urbanización Las Delicias en el pueblo de Aibonito. De la misma manera, se desprende del contrato la necesidad de autorización por parte de la agencia Administración de Reglamentos y Permisos (ARPE). Es por ello, que el señor Benítez Colón le requirió a la señora Cortés Rivera los planos de la estructura a ser utilizados. Según las alegaciones de la demanda, la señora Cortés Rivera contrató al Ingeniero Daniel Oquendo para el diseño del plano y se le encomendó la dirección de la obra. Surge del acuerdo, que el ingeniero Daniel Oquendo supervisaría la construcción llevada a cabo por el señor Colón Benítez. A su vez, las partes acordaron que la obra no tardaría más de nueve (9) meses y que la señora Cortés Rivera pagaría la cantidad de $120,000.00, a ser financiada por el Banco Popular de Puerto Rico.

La señora Cortés Rivera alegó que, el contratista Colón Benítez entregó la obra sin concluir, a pesar de que había recibido el pago en su totalidad. Adicionalmente, la señora Cortés Rivera sostuvo que la propiedad fue entregada posterior a la fecha pautada, es decir el 2 de febrero de 2010. El 5 de abril de 2010, la señora Cortés Rivera le requirió mediante comunicación escrita, la continuación de la obra, junto con la corrección de deficiencias que había en la residencia.[2]

La señora Cortés Rivera arguyó que, para el año 2014, se comunicó con el demandado por la construcción realizada y le informó que la misma contenía las siguientes deficiencias: a) desprendimiento de la tubería de aguas usadas; b) el agua que desecha la lavadora a la tubería, sube a través de la loza; c) al utilizarse el fregadero, la tubería hace fuertes ruidos y el agua retorna al fregadero, por lo que lo hace inutilizable; d) grietas en las paredes de uno de los cuartos, marquesina, sala y pasillo de la

---

[2] SUMAC, Entrada núm. 50.

residencia, las cuales requieren atención inmediata; e) manchas de humedad en el área del Jacuzzi. De la misma forma, señaló que le notificó al señor Colón Benítez y que este hizo caso omiso a sus reclamos. En adición a lo anterior, tuvo que contratar, a su costo, a una tercera persona, el señor José Manuel Pérez Reyes para cotizar las deficiencias antes mencionadas.[3]

Posteriormente, se presentó la demanda el 12 de junio de 2019. El contratista Colón Benítez mediante su alegación responsiva argumentó que, entregó dicha construcción oportunamente y de manera completa con el debido permiso de uso. Añadió que, las deficiencias en la propiedad se debían al mero paso del tiempo y los daños causados por los huracanes pasados. Además, negó responsabilidad por las alegaciones de la demanda.

Trabada la controversia entre las partes, y luego de un largo trámite procesal y una trayectoria del desarrollo de este litigio, se llevó a cabo el descubrimiento de prueba. **Se desprende del expediente de autos que, como parte del descubrimiento de prueba, se llevó a cabo una inspección ocular.** Según se desprende de la minuta del Tribunal, junto con la comparecencia del juzgador del foro de instancia, asistieron las partes con sus respectivos representantes legales, también se encontraba presente, el perito de la señora Cortés Rivera Ingeniero Manuel Rolón Marrero y el perito del matrimonio Colón Rivera para arreglos, inspecciones periciales entre otros asuntos.[4]

El 22 de junio de 2022, se celebró Vista sobre el Estado de los Procedimientos. En ella, el TPI le ordenó presentar en SUMAC la prueba documental. En cumplimiento, las partes presentaron un escrito acompañando lo requerido. Como prueba documental estipulada entre las partes presentaron: (1) copia del contrato de

---

[3] *Íd.*, pág. 112- líneas 24-25; pág. 113, líneas 1-25.
[4] SUMAC, Entrada núm. 34.

construcción, (2) permiso de uso, (3) cotización preparada por Cawape Construction Inc. Por otro lado, como prueba documental de la señora Cortés Rivera se sometió: (1) Copia del contrato de construcción (2) Permiso de uso; (3) Fotos (6) Muestran tubería de desagüe de la máquina de lavar ropa (1), techo inferior de la propiedad (1) y cuatro [(4)] fotos conteniendo textos enviados al demandado; (4) Informe de inspección; (5) Cotización preparada por Cawape Construction Inc.; (6) Informe perito Ingeniero Manolo Rolón; (7) Informe Perito Plomero Josie E. Pérez López, licencia 1145. (8) Informe de Geotchnical Engennering Services, PSC.; (9) Carta del 5 de abril de 2010 suscrita por la demandante enviada al demandado. El matrimonio Colón Rivera presentó como prueba documental: (1) Contrato de Construcción y (2) Informe del perito Ingeniero William Aguilú PE MEM licencia 15913.[5]

Celebrado el Juicio en su Fondo y evaluados los testimonios periciales, sus informes e incluyendo las declaraciones de ambas partes, el foro primario estableció las siguientes **Determinaciones de Hechos**, las cuales forman parte de la *Sentencia*.

1. Para el año 2009, la Demandante contrató los servicios del Codemandado señor Benjamín Colón para la construcción de la Propiedad. El Codemandado es contratista autorizado bajo las leyes de Puerto Rico.
2. El Codemandado le indicó a la Demandante que necesitaba tener los planos para poder realizar una cotización de la construcción. La Demandante contrató los servicios del ingeniero Daniel Oquendo para la preparación del plano y la dirección de la obra.
3. Con los planos terminados, las partes firmaron contrato de construcción el día 29 de abril de 2009. Este contrato establecía que se haría la obra por la cantidad de $120,000.00.
4. La obra sería financiada a través de un préstamo de construcción que la Demandante obtuvo con la Institución Banco Popular de Puerto Rico.
5. Para el año 2014 aproximadamente, la Demandante comunicó con el Codemandado y le notificó que la

---

[5] SUMAC, Entrada núm. 50

edificación realizada por éste mostraba las siguientes deficiencias: **a) salidero de agua por el muro de contención hacia el patio de la casa. b) el agua que desecha la lavadora a la tubería sube a través de la loza; c) al utilizarse el fregadero, la tubería hace fuertes ruidos y el agua retorna al fregadero, por lo que lo hace inutilizable; d) grietas en las paredes de uno de los cuartos, marquesina, sala y pasillo de la residencia, las cuales requieren atención inmediata.**

6. De una inspección realizada el 17 de enero de 2020 por el ingeniero Manuel Rolón Marrero, se corroboró:

   a. **Que no se puede utilizar la pileta del "laundry" en la Propiedad debido a que el agua de la lavadora y de la propia pileta no descarga por la tubería principal de la vivienda**. Esta tubería de descarga de la pileta de dos pulgadas de diámetro descarga a tubería de cuatro pulgadas que discurre de izquierda a derecha de la residencia en este nivel para entonces bajar al nivel de sótano y al pozo séptico;

   b. **Existe una pendiente invertida en el balcón desde el comedor de la Propiedad; el agua discurre hacia adentro del comedor**;

   c. **En la sala de la Propiedad existen fisuras en las paredes**;

   d. **Existe una pendiente invertida en el balcón desde el comedor de la Propiedad; el agua discurre hacia adentro de la sala;**

   e. El agua del jacuzzi en la Propiedad filtra hacia el sótano por razón de que **el jacuzzi fue instalado incorrectamente**, por lo que filtrara agua de llenado o descarga en la losa de piso;

   f. **El muro de contención en la Propiedad fue desplazado hacia atrás de la fachada posterior 11'-6" disminuyendo el área de sótano en cuatrocientos sesenta pies cuadrados (460 p.c.) de área utilizable de esta área**;

   g. **La esquina lateral derecha de la marquesina en la Propiedad se apreció una deflexión de entre 1" a 2" en la losa de piso,** lo cual pudieran comprometer de manera innecesaria la estructura en eventos sísmicos;

   h. **El demandado alteró y se apartó de los planos de construcción**, creando una

situación indeseada de esfuerzos cortantes en los apoyos de la viga de carga transversal, condición para la que no fue diseñada; y

i. **No se instaló tubería de ventilación en área de cocina**. Esta tubería se instala para regular las presiones en la tubería y sacar los malos olores de esta.

7. De la exploración de subsuelo realizada por el Geotechnical Engineering Services, PSC y reportada el 21 de mayo de 2021 y el testimonio del ingeniero Aniel Gerardo Grillasca Rodríguez, el tribunal concluye que:

a. **Existen varias depresiones detrás del muro de retención en la Propiedad, el cual fue construido por el demandado**, para salvar la diferencia en elevación entre la parte frontal y parte trasera de la casa;

b. **La parte trasera de la casa está sostenida por el muro de retención y sobre columnas** y la parte de abajo se usa como marquesina. **La parte frontal de la casa descansa sobre el muro de retención y el relleno depositado detrás del muro**;

c. **El Demandado colocó el relleno detrás del muro de retención y, por consiguiente, debajo de la losa de piso, sin ninguna compactación, lo cual propició que el relleno colapsara**;

d. **El relleno utilizado por el Demandado no cumple con las clasificaciones adecuadas para su uso como material de relleno**. Un relleno selecto debe tener una clasificación entre A-1-a, A-1-b, A-2-4, o A-2-6, basado en el sistema de clasificación de American Association of State Highway and Transportation Officials (AASHTO). Los rellenos utilizados en el proyecto, sus clasificaciones variaron entre A-2-7 y A-7-6;

e. **Al no haberse compactado el relleno y este colapsar, la losa de piso en la parte frontal de la casa no está actuando para lo cual fue diseñada**, descansando sobre terreno, por el contrario, está actuando como losa estructural, lo cual conlleva un diseño más riguroso, del punto de vista de refuerzos de acero. El dejar esta losa en el aire, conllevará que con los años la losa flexione marcadamente. Ante un sismo,

esta losa va a sufrir deformaciones severas o roturas, dado que no tiene el suelo como sistema de amortiguamiento. **Este se pudo haber evitado si se hubiese utilizado el relleno adecuado y si se hubiese compactado**, según antes indicado; [...]

f.  El costo de la inyección de hormigón para rellenar la cavidad supera los $45,000.00 en el mercado, dado los altos costos en materiales de construcción y por ser este un trabajo altamente técnico, por lo que solo muy pocas compañías de construcción tienen la capacidad de ejecutarlo adecuadamente.

Así las cosas, el Tribunal de Primera Instancia, Sala Superior de Aibonito, declaró *Ha Lugar* la demanda presentada, y concedió a la señora Cortés Rivera, la cantidad de $45,000.00 por daños ocasionados a la propiedad de la parte demandante y $15,000.00 por concepto de sufrimientos, angustias mentales y daños morales ocasionados a la demandante Nilda Cortés Rivera.

**KLAN202300282:**

Inconforme con la *Sentencia* dictada por el TPI, el 6 de marzo de 2023 la señora Cortés Rivera solicitó reconsideración de la *Sentencia*.[6] En esencia, adujo que, el foro primario creyó en su totalidad el testimonio pericial y propio, pero que la cantidad concedida a su favor no cubría las reparaciones en su totalidad. Por lo que era preciso enmendar la sentencia para otorgarle una mayor partida a su favor. El 7 de marzo de 2023 y notificada el 10 de marzo del mismo año, el foro primario la declaró *No Ha Lugar*.[7]

Aún inconforme con dicha determinación, presentó el recurso de apelación KLAN202300282 y le imputó al foro apelado la comisión del siguiente señalamiento de error:

Erró el TPI al no conceder las partidas de dinero necesarias para las reparaciones de la tubería sanitaria de la propiedad de la demandante y al no conceder la partida por los vicios de construcción desglosados por el Perito Ingeniero Manolo Rolón Marrero, a pesar de

---

[6] Apéndice II del Recurso de Apelación KLAN202300282, págs. 11-17.
[7] Apéndice III del Recurso de Apelación KLAN202300282, pág. 18.

que el TPI diera entera credibilidad a los testigos presentados por la parte demandante.

**KLAN202300288**:

Por su parte, el matrimonio Colón Rivera inconforme con la *Sentencia* dictada por el Tribunal de Primera Instancia, el 6 de marzo de 2023, solicitó reconsideración de la *Sentencia* dictada. En síntesis, sostuvo que el Tribunal debía imponerle responsabilidad al Ingeniero Oquendo, conforme al artículo 1483 del Código Civil de Puerto Rico, 31 LPRA sec. 4124 (derogado). Asimismo, adujo que el contrato era escueto y que la señora Cortés Rivera no presentó prueba sobre los daños morales, por lo que no correspondía ninguna partida a su favor.[8] El 13 de marzo de 2023 y notificada el 15 de marzo del mismo año, el Tribunal de Primera Instancia la declaró *No Ha Lugar*.[9] Aún inconforme con dicha determinación, presentó el recurso de apelación KLAN202300288 y le imputó al foro de origen la comisión de los siguientes errores:

a) Err[ó] el Tribunal de Primera Instancia al resolver que los demandados son responsables por los vicios de subsuelo descritos en la sentencia emitida.

b) Err[ó] el Tribunal de Primera Instancia al emitir una Sentencia que es contraria a los hechos esgrimidos por el propio Tribunal, específicamente el testimonio vertido por los peritos de la parte demandante en cuanto a la responsabilidad del ingeniero que dirige la obra sobre los vicios de suelo.

c) Err[ó] el Tribunal de Primera Instancia en conceder daños morales por la suma de $15,000.00 sin que la parte demandante-apelada presentara prueba al respecto.

d) Err[ó] el Tribunal de Primera Instancia al resolver que los demandados incumplieron con el contrato de construcción toda vez que los planos de construcción no fueron presentados ante el Honorable Tribunal para su evaluaci[ó]n.

Examinados los recursos en su totalidad, con la comparecencia de ambas partes, y conforme a las Órdenes

---

[8] Apéndice D del Recurso de Apelación KLAN202300288, págs. 19-27.
[9] Apéndice E del Recurso de Apelación KLAN202300288, pág. 28.

Administrativas DJ-2019-316 y DJ-2019-316A se ordenó la consolidación de los dos recursos. Por lo que procedemos a establecer el derecho aplicable y resolver.

**-II-**

*-A-*

Es norma reiterada que los Tribunales Apelativos no debemos intervenir con la apreciación de la prueba que realizan los tribunales de instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Torres González v. Zaragoza Meléndez,* 211 DPR 821, 846 (2023); *WMM, PFM et al. v. Colegio et al.*, 211 DPR 871,903 (2023); *Super Asphalt. v. AFI,* 206 DPR 803, 820 (2021)*; Gómez Márquez v. Periódico el Oriental Inc.,* 203 DPR 783, 784 (2020).

En ese contexto, el Tribunal Supremo enfatizó que un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia." *Argüello v. Argüello*, 155 DPR 62, 79 (2001). Pero, si la apreciación de la prueba no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la evaluación se distancie de la realidad fáctica o esta es inherentemente imposible o increíble tenemos la responsabilidad ineludible de intervenir. **Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida**, **no exista base suficiente que apoye su determinación".** *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 220 (2021). (Énfasis suplido).

El Tribunal de Apelaciones no debe elaborar sobre la pasión, el prejuicio y la parcialidad si no puede fundamentar que esto ocurrió en el caso ante su consideración. Quien señale que el juzgador actuó mediando pasión, prejuicio o parcialidad debe sustentar sus

alegaciones con evidencia suficiente, pues estas no deben convertirse en un instrumento para ejercer presión contra el Tribunal de Primera Instancia. *Gómez Márquez v. Periódico el Oriental Inc., supra*, pág. 785.

### -B-

Nuestro ordenamiento jurídico establece que las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia. 31 LPRA sec. 2992; *Cruz Cruz v. Casa Bella Corp.*, 2024 TSPR 47, 213 DPR ___ (2024).[10] Según el Código Civil de Puerto Rico, 1930, 31 LPRA, (en adelante Código Civil de 1930), para que un contrato sea válido este debe contener el consentimiento de los contratantes, un objeto cierto y causa de la obligación que se establezca. 31 LPRA sec. 3391. El consentimiento se manifiesta por el concurso de la oferta y la aceptación sobre la cosa y la causa que han de constituir el contrato. 31 LPRA sec. 3401. Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan. Siendo así, una vez perfeccionado dicho contrato, éste tiene fuerza de ley entre las partes. *López Torres v. González Vázquez*, 163 DPR 275, 281 (2004); *Mercado Quilichini v. UCPR,* 143 DPR 610, 627 (1997).

En nuestra jurisdicción opera el principio de libertad de contratación. 31 LPRA sec. 3372. *Álvarez v. Rivera*, 165 DPR, 1, 17 (2005); *Trinidad v. Chade*, 153 DPR 280, 289 (2001). El artículo 1207 del Código Civil de 1930 establece que, "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan

---

[10] Debido a que los hechos ocurrieron antes del 28 de noviembre de 2020, hacemos constar que es de aplicación el Código Civil de 1930, el cual fue derogado por la Ley Núm. 55-200, también conocida como el "Código Civil de 2020". No obstante, esta última pieza legislativa en su Artículo 1812 establece lo siguiente: "Los actos y contratos celebrados bajo el régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos sus efectos según la misma, con las limitaciones establecidas en este Código". 31 LPRA sec. 11717. Por tanto, para propósitos de la adjudicación del caso, se utilizarán las disposiciones del Código Civil derogado.

por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". 31 LPRA sec. 3372; *VDE Corporation v. F&R Contractors,* 180 DPR 21, 33 (2010); *Plaza del Rey, Inc., v. Registrador*, 133 DPR 188, 192-193 (1993). Por tanto, los contratos serán obligatorio, cualquiera que sea la forma que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez. 31 LPRA sec. 3451. A su vez, es preciso señalar que, cuando los términos de un contrato son claros y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. 31 LPRA sec. 3471.

**El Artículo 1054 del Código Civil de 1930 dispone que quedan sujetos a indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier otro modo contravinieren a tenor de aquellas**. 31 LPRA sec. 3018. *Cruz Cruz v. Casa Bella Corp., supra.* (Énfasis suplido). Es importante destacar que, la buena fe contractual no se manifiesta tan sólo al comienzo del contrato o en la fase de la negociación, sino que está presente mientras dure la relación contractual. En consecuencia, "**cuando el incumplimiento de una obligación contractual produjere daños a una de las partes contratantes, procede una acción de daños y perjuicios por incumplimiento contractual**". *Soc. de Gananciales v. Vélez & Asoc.,* 145 DPR 508, 521 (1998); (Énfasis suplido). Por consiguiente, "[l]as acciones *ex contractu* solo pueden ser ejercidas por una parte contratante en contra de la otra". *Rivera Sanfeliz v. Jta. Dir. FirstBank*, 193 DPR 38, 57 (2015).

El Código Civil de Puerto Rico distingue entre las acciones de daños y perjuicios extracontractuales y las acciones derivadas del incumplimiento contractual, bajo el Artículo 1054 del Código Civil, *supra.* "Mientras que la acción de daños y perjuicios

extracontractuales del Artículo 1802 [hoy Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801], protege el deber general de diligencia necesario para la convivencia social, la acción *ex contractu* se fundamenta en el incumplimiento de un deber que surge de un acuerdo de voluntades previo entre las partes*". Muñiz-Olivari v. Stiefel Labs.,* 174 DPR 813, 818 (2008). Recordemos que "[l]a culpa o negligencia a que se refiere el artículo 1802 del Código Civil, 31 LPRA sec. 5141 [hoy Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801], es aquella no relacionada con una obligación anterior. *Ramos Lozada v. Orientalist Rattan Furniture, Inc.,* 130 DPR 712, 721 (1992). Sino a los principios generales de convivencia social que suponen no causar un daño a otro". *Rivera Sanfeliz v. Jta. Dir. FirstBank, supra,* pág. 57.

No obstante, bajo este prisma normativo, **la reclamación por los daños procede cuando éstos son consecuencia exclusiva del incumplimiento con la obligación contractual**. *Ramos Lozada v. Orientalist Rattan Furniture, Inc., supra*, pág. 727. (Énfasis suplido). Así pues, si el hecho que constituye un incumplimiento contractual también constituye una violación extracontractual, el demandante podrá escoger la causa de acción para vindicar sus derechos. *Íd.,* pág. 728.

-**C**-

El daño se ha definido como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". *López v. Porrata Doria*, 169 DPR 135, 151 (2006); (*citando a* J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 92). Puesto que, de no existir daño o perjuicio, no existiría una obligación de indemnizar. *Íd.,* pág. 151. Por ello, es esencial que se demuestre la realidad de un daño y su cuantía. *Íd.,* pág. 151.

Los daños se dividen en patrimoniales y no patrimoniales. *Sagardía De Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 505 (2009). Los primeros consisten en el menoscabo monetario del patrimonio de la parte perjudicada. *Íd.*, págs. 505-506. Por su parte, los daños no patrimoniales "son en principio aquellos cuya valoración en dinero no tiene la base equivalencial que caracteriza a los patrimoniales, por afectar precisamente a elementos o intereses de difícil valoración pecuniaria". *Íd.*, pág. 506 (*citando a* J. Santos Briz, *Tratado de Derecho Civil*, Barcelona, Ed. Bosch, 2003, T. III, pág. 457).

Los daños morales son parte de los daños no patrimoniales. Sin embargo, los daños morales puros, los cuales no producen repercusiones de carácter patrimonial, se distinguen de los daños morales impropios o patrimoniales indirectos que trascienden valores del patrimonio. *Íd.,* pág. 506. De forma general, los daños morales son infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica de la parte perjudicada. *Íd.,* pág. 506; *Rivera v. SLG Díaz*, 165 DPR 408, 428 (2005). Dichos daños morales son amplios y abarcan el dolor físico o corporal, las angustias mentales, hasta los daños o las lesiones corporales. *Íd.*, págs. 506-507. La lesión o el daño corporal producto de un acto torticero puede incluir desde golpes leves hasta un daño grave que culmine en muerte. *Íd.*, pág. 507. Dicho daño es resarcible de manera independiente dentro de los daños morales. *Íd.,* pág. 507. Una lesión o un daño corporal se puede manifestar tanto de dolor físico como psíquico o angustias mentales. *Íd.,* pág. 507.

### -D-

El artículo 1483 del Código Civil de 1930, dispone sobre la responsabilidad de un contratista por los vicios de construcción que provoquen la ruina de un edificio. En esencia, el precitado artículo establece lo siguiente:

> **El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez (10) años, contados desde que concluyó la construcción**; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.
>
> **Si la causa fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince (15) años.** 31 LPRA sec. 4124. (Énfasis suplido).

A tenor con el antedicho artículo, nuestro máximo foro judicial ha reiterado que, en ese concepto de daños, el contratista y el arquitecto que dirigen la obra responden en daños y perjuicios. "En casos de vicio o ruina corregible de la estructura, responden, para incluir no solo la obligación de reparar los defectos sino también la de indemnizar por los daños previsibles". *De Jesús v. Ponce Housing Corp,* 104 DPR 885, 889-890 (1976).

Ahora bien, el Tribunal Supremo de Puerto Rico se ha pronunciado sobre los vicios de construcción, señalando que "[h]emos establecido la existencia de cuatro tipos distintos de ruina que puede sufrir un edificio, a saber: ruina total, ruina parcial, amenaza de ruina y ruina funcional". *Pacheco v. Estancias*, 160 DPR 409, 420 (2003). Nuestro más alto foro ha diferenciado cada existencia de daño de la siguiente forma: "[**e]xiste ruina total** cuando se compromete la solidez o estabilidad del edificio. *(citas omitidas).* La **ruina parcial** provoca el derrumbamiento de uno de los elementos estructurales del edificio, pero no la totalidad de éste. **La amenaza de ruina** implica la degradación parcial de los elementos del edificio que, a su vez, compromete su solidez estructural o parte de ésta". *Pacheco v. Estancias, supra,* pág. 420. (Énfasis suplido).

Además, "no es necesario que los vicios de construcción que afectan un edificio amenacen su estabilidad para que se considere que éste está en ruina. **Se considera que *un edificio se encuentra en estado de ruina funcional* cuando los vicios de los que adolece: (1) amenazan la seguridad pública o estabilidad del**

**edificio; (2) le causan un perjuicio grave al dueño; (3) tornan la obra en impropia para el uso a que se le destina, o (4) *exceden las medidas de las imperfecciones que cabe esperar razonablemente en una construcción*.** La presencia de cualquiera de estas situaciones en una construcción produce un estado de ruina funcional. El hecho de estar la estructura en ese estado no implica que estén amenazados de ruina sus elementos vitales. No obstante, se afecta severamente su utilización y disfrute". *Pacheco v. Estancias, supra,* pág. 421. (Énfasis suplido); (Bastardillas en el original).

En adición a lo anteriormente expuesto, el Tribunal Supremo de Puerto Rico sostiene que:

**Una vez el dueño del edificio presenta prueba que demuestre que los vicios de construcción que sufre el edificio provocan alguno de los tipos de ruina antes mencionados, <u>se activa una presunción de culpa, de negligencia o de ambas en contra del contratista que tuvo a su cargo la construcción</u>. Le corresponde entonces al contratista presentar prueba que demuestre la inexistencia de la ruina o que ésta no fue causada por su negligencia, o ambas. Por lo tanto, se trata de una presunción *iuris tantum*, la cual tiene que ser rebatida por la parte en contra de la cual ésta opera, o sea, el contratista. Si no se presenta prueba para rebatir el hecho básico que da lugar a la presunción, el juzgador está obligado a dar por probado el hecho presumido.** *Pacheco v. Estancias, supra,* pág. 421. (Énfasis y subrayado suplido); (Bastardillas en el original); *Roselló Cruz v. Garcia,* 116 DPR 511, 519 (1985).

Es por ello que, en adición sobre la presunción establecida, "[p]ara librarse de responsabilidad el contratista, si se trata de vicios de la construcción, o el arquitecto, si se trata de vicios del suelo, **vendría obligado a probar mediante preponderancia de prueba que no se deben a su intervención**, sino que se trata de un caso de fuerza mayor, totalmente imprevisible e inevitable en los conocimientos y medios técnicos de la profesión. El concepto de fuerza mayor, como eximente de la responsabilidad de contratistas y arquitectos, debe entenderse en forma más restrictiva que de

ordinario, pues se trata de sucesos que éstos tienen que tomar en consideración al edificar. Así, cuando la ruina, que[,] causada por un terremoto, huracán, etcétera, pudo ser evitada por medio de la aplicación de los conocimientos y técnicas profesionales, no puede ser considerada un resultado de fuerza mayor". *Roselló Cruz v. García, supra*, pág. 519. (Énfasis suplido).

Nuestro más alto Foro judicial ha añadido que **"[a]ún más, existen algunos supuestos en los cuales es posible que el constructor responda por vicios que pertenecen a la esfera de responsabilidad del arquitecto**. Situaciones como las siguientes pueden provocar que a causa de la conducta del contratista, hechos definidos como 'vicios del suelo' queden bajo su responsabilidad: **cuando el constructor conocía de los vicios del suelo y no se lo manifestó al arquitecto**; **seguir construyendo cuando le constaba que el arquitecto no los había subsanado, o cuando se trata de vicios del suelo groseros, esto es**, **defectos que el contratista tenía el deber de conocer porque entran dentro de lo exigible a cualquier profesional de la construcción**". *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 725 (1986). (Énfasis suplido).

*-E-*

Tanto como las Reglas de Procedimiento Civil, 32 LPRA Ap. V. como las Reglas de Evidencia, 32 LPRA Ap. VI, regulan la participación e intervención de los peritos. En esencia, la Regla 702 de Evidencia establece sobre el testimonio pericial:

> Cuando conocimiento científico, técnico o especializado sea de ayuda para la juzgadora o el juzgador poder entender la prueba o determinar un hecho en controversia, una persona testigo capacitada como perita -conforme a la Regla 703- podrá testificar en forma de opiniones o de otra manera. **El valor probatorio del testimonio dependerá, entre otros, de: (a) si el testimonio está basado en hechos o información suficiente; (b) si el testimonio es el producto de principios y métodos confiables;** (c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; **(d) si el principio subyacente al testimonio ha sido aceptado generalmente en la**

**comunidad científica;** (e) las calificaciones o credenciales de la persona testigo; y (f) la parcialidad de la persona testigo. La admisibilidad del testimonio pericial será determinada por el Tribunal de conformidad con los factores enumerados en la Regla 403.

De igual forma, la Regla 703 de Evidencia, *supra*, dispone que:

**Regla 703. Calificación como persona perita** (A) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita. (B) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio. (C) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

La jurisprudencia del Tribunal Supremo de Puerto Rico ha establecido que "un perito es una persona que, a través de la educación o experiencia, ha desarrollado un conocimiento o destreza sobre una materia de manera que puede formar una opinión que sirva de ayuda al juzgador". *McNeil Healthcare, LLC v. Municipio de Las Piedras*, 206 DPR 659, 677 (2021); *SLG Font Bardón v. Mini-Warehouse*, 179 DPR 322, 338 (2010). Adviértase que, nuestro Tribunal Supremo ha interpretado al profesor Chiesa, y ha intimado que "el valor probatorio del testimonio pericial depende de varios factores, entre los que se destacan los siguientes: (1) las cualificaciones del perito; (2) la solidez de las bases de su testimonio; (3) la confiabilidad de la ciencia o técnica subyacente, y (4) la parcialidad del perito". *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. Of Puerto Rico, Inc.*, 150 DPR 658 664 (2000); Ernesto L. Chiesa, Práctica Procesal Puertorriqueña: Evidencia, San Juan, Pubs. J.T.S., 1983, Vol. I, pág. 245. Nótese además que, nuestro máximo foro ha detallado que la especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio. *Íd.* pág.664.

Adicionalmente, como tribunal apelativo, "tenemos amplia discreción en la evaluación de la prueba pericial. No estamos obligados a 'seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito facultativo'. Tenemos plena libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial. Incluso, podemos descartarla[,] aunque resulte técnicamente correcta". *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006). Además, como tribunal revisor, "es norma reiterada la de respetar y sostener la apreciación que hagan los jueces de instancia de la prueba que ante ellos se ofrece. **Solamente hemos de altera[r] esos dictámenes en casos de error manifiesto en el desempeño de dicha función, cuando un examen detenido de toda la prueba nos convence que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables, o increíbles"**. *C. Brewer PR., Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). (Énfasis suplido).

**-III-**

En el recurso **KLAN202300282**, la señora Cortés Rivera nos señala que incidió el foro de origen al no conceder las partidas de dinero necesarias para las reparaciones de la tubería sanitaria de la propiedad de la demandante y al no conceder la partida por los vicios de construcción desglosados por el perito ingeniero Rolón Marrero, a pesar de que el juzgador diera entera credibilidad a los testigos presentados por la parte demandante.

Según se desprende de la *Comparecencia Especial* del Tribunal de Primera Instancia, el juzgador de los hechos basó sus determinaciones y otorgó las partidas de acuerdo con la prueba vertida en el Juicio en su Fondo. Las cuantías otorgadas estuvieron fundamentadas en la valorización esgrimida por los peritos de la señora Cortés Rivera. Según se desprende de la Transcripción de la

Prueba Oral, el Tribunal concedió las cuantías para cubrir la reparación basado en el testimonio del Ingeniero Grillasca Rodríguez,[11] quien pormenorizó sobre los costos que conlleva reparar el defecto estructural por la ausencia de compactación del suelo. Por otro lado, el Foro a *quo* justificó las partidas concedidas brindándole especial deferencia al testimonio del Ingeniero Rolón Marrero,[12] quien explicó detalladamente el importe de los gastos en los que se tendrían que incurrir para reparar la propiedad. Por último, podemos observar en el desglose realizado por el juzgador de los hechos,[13] que el Tribunal de Primera Instancia utilizó las cotizaciones preparadas por Cawape Construction Inc.,[14] JP Plumbing Contractors Inc.,[15] y valoró el testimonio del plomero Josie J. Pérez López para fundamentar sus conclusiones sobre las cuantías otorgadas.[16]

Por tanto, luego de un estudio mesurado del expediente ante nuestra consideración a la luz del derecho aplicable, habida cuenta que ante el Foro primario quedó demostrado la existencia de los defectos o vicios de construcción relacionados a la estructura de la señora Cortés Rivera, resolvemos que el dicha Instancia judicial no erró al conceder tales partidas para cubrir las reparaciones. Ello, tras analizar las circunstancias particulares del presente caso, brindamos total deferencia a la cuantía concedida y desglosada por el foro sentenciador. *No se cometió el error señalado.*

---

[11] Transcripción de Juicio en su Fondo, fecha 21 de diciembre de 2022, testigo Ingeniero Aniel Grillasca Rodríguez pág. 38, líneas 12-25; pág. 39, líneas 1-3; pág. 39, líneas 1-3, 12-25; pág. 40, líneas 1-25; pág. 41, líneas-1-13.

[12] Transcripción de Juicio en su Fondo, fecha 21 de diciembre de 2022, testigo Ingeniero Manuel Rolón Marrero pág. 34, líneas 1-25; pág. 35, líneas 1-20; pág. 36, líneas 16-25; pág. 37, líneas 1-11,15-24.

[13] Transcripción de Juicio en su Fondo, fecha 21 de diciembre de 2022, testigo Ingeniero Manuel Rolón Marrero pág. 34, líneas 1-25; pág. 35, líneas 1-20; pág. 36, líneas 16-25; pág. 37, líneas 1-11,15-24.

[14] SUMAC Entrada Núm. 50.

[15] *Íd.*

[16] Transcripción de Juicio en su Fondo, fecha 17 de octubre de 2022, testigo Josie Pérez López, pág. 39-62.

Por su parte en el recurso **KLAN202300288**, el matrimonio Colón Rivera presenta cuatro señalamientos de error. Por estar estrechamente relacionados, procederemos a discutir en conjunto los errores (a), (b) y (d) presentados en el recurso promovido por el matrimonio Colón Rivera. En síntesis señalan: (a) erró el Tribunal de Primera Instancia al resolver que el señor Colón Benítez era responsable de los vicios del subsuelo; (b) erró el tribunal primario al emitir una sentencia contraria a los hechos esgrimidos, específicamente el testimonio vertido por los peritos que en cuanto a la responsabilidad del ingeniero que dirige la obra sobre los vicios del suelo; (d) erró el Tribunal de Primera Instancia al resolver que los demandados incumplieron el contrato de construcción, toda vez que los planos de construcción no fueron presentados ante el foro primario. *No le asiste la razón.*

De una lectura integral de la sentencia, el tribunal adjudicó responsabilidad al contratista Colón Benítez por apartarse de las especificaciones en el plano preparado para la realización de la obra que causaron los vicios de construcción descritos en las determinaciones de hechos 5, 6 y 7, antes citados. Como se puede apreciar, sobre el testimonio del ingeniero Rolón Marrero y los hechos destacados en la *Sentencia* apelada, el ingeniero Rolón Marrero, en esencia, subrayó los vicios que tiene la estructura de la propiedad: la falta de tuberías, las pendientes invertidas, la deflexión de las losas, entre otras situaciones indeseadas en la propiedad, son enteramente producto de la realización de la construcción y de la obra del contratista. No podemos coincidir en que dicho incumplimiento esté dirigido a los vicios del suelo o subsuelo como aduce el matrimonio Colón Rivera.

De la misma manera, según los hechos establecidos por el Tribunal, el ingeniero Rolón Marrero concluyó que, el desplazamiento hacia atrás de la fachada y el muro de contención

no se hizo conforme a los planos de construcción diseñados por el Ingeniero Daniel Oquendo.[17] A su vez, el perito ingeniero Aniel Grillasca Rodríguez enfatizó que los vicios ocultos que sufre la construcción son a causa del relleno excavado por el contratista Colón Benítez, quien reconoció que movilizó terreno y no compactó adecuadamente.[18] Este último, también admitió haberse alejado de los planos provistos en múltiples ocasiones para la construcción de la casa.[19]

Asimismo, el matrimonio Colón Rivera intimó que el tribunal debería responsabilizar al ingeniero Oquendo, debido a que son vicios de subsuelo y que la ruina se presume al ingeniero de la obra. Igualmente, sostuvo que correspondía al ingeniero Oquendo solicitar un estudio de suelo, según fue testificado por el perito Grillasca Rodríguez. Sin embargo, es preciso destacar que la responsabilidad que se desprende de las Determinaciones de Hechos antes expuestas por el foro sentenciador, no está adjudicada por el vicio del subsuelo. Si bien el ingeniero Grillasca Rodríguez declaró sobre las cualidades y características del suelo, la responsabilidad detallada en los hechos 5, 6, y 7 de las Determinaciones de Hecho precitados y adjudicada por el Tribunal de Primera Instancia al contratista Colón Benítez es por haberse alejado de los planos y por haber realizado la construcción de manera negligente.

Como mencionamos previamente, según la jurisprudencia expuesta, una vez el dueño del edificio presenta prueba que demuestre que los vicios de construcción que sufre el edificio provocan alguno de los tipos de ruina antes mencionados, se activa una presunción de culpa, de negligencia o de ambas en contra del

---

[17] Transcripción de Juicio en su Fondo, fecha 19 de diciembre de 2022, testigo Ingeniero William Aguilú Santiago, pág. 8 líneas 13-23.
[18] Transcripción de Juicio en su Fondo, fecha 21 de diciembre de 2022, testigo señor Benítez Colón, pág. 27, línea 3-23; pág. 28 línea 2-11
[19] *Íd.*

contratista que tuvo a su cargo la construcción. *Pacheco v. Estancias, supra,* pág. 421. Dicho lo anterior, esta presunción no fue rebatida en el caso de marras, por lo que el Tribunal de Instancia venía obligado a dar por probado dicho hecho.[20]

El matrimonio Colón Rivera sostiene en su alegato que le correspondía a la señora Cortés Rivera demostrar qué cláusula concreta del contrato se violó para adjudicarle responsabilidad al contratista Colón Benítez. A su vez, añade que el contrato era uno corto y escueto. Argumenta también que, el tribunal primario descansó en el informe pericial del ingeniero Manuel Rolón para determinar que el contratista Colón Benítez se apartó de los planos, aunque estos no fueron presentados.

Es preciso señalar que, ante el Tribunal de Primera Instancia no se desfiló prueba alguna sobre el plano de construcción de la propiedad preparado por el Ingeniero Daniel Oquendo. Sin embargo, durante el juicio ambas partes y sus peritos testificaron sobre el plano y los cambios que surgieron en el desarrollo de la construcción. Sin embargo, el tratamiento a los peritos en el tribunal es muy particular. Pues es sabido que una persona perita puede declarar sobre sus opiniones o inferencias y expresar las razones que las fundamentan sin haber declarado antes sobre los hechos o datos en que sus opiniones o inferencias están basadas, salvo que el Tribunal lo requiera. En todo caso, se le podrá requerir a la persona perita que revele los hechos o datos en los que basa sus opiniones o inferencias durante el contrainterrogatorio. 32 LPRA IV.R.705.   Por lo que es inmeritorio la alegación del matrimonio Colón Rivera a los fines de que no se presentó el plano, esto debido

---

[20] El perito del matrimonio Colón Rivera, el Ingeniero Aguilú Santiago no pudo rebatir mediante una presunción de corrección el testimonio presentado por los peritos de la señora Cortés Rivera. Transcripción de Juicio en su Fondo, fecha 19 de diciembre de 2022, testigo Ingeniero William Aguilú Santiago, pág.66 líneas 15-22, pág. 108, línea 25; pág. 109, líneas 1-4; pág. 138 líneas 13-25; pág. 140, líneas 6-25; pág. 141, líneas 1-3.

a que el contratista Colón Benítez utilizó el plano durante la construcción de la propiedad.

De la misma forma, el contratista Colón Benítez testificó sobre los cambios que él realizó y que, se apartó del plano en repetidas instancias según se desprende de su testimonio vertido durante el Juicio en su Fondo.[21] Es por ello que, decretada la ruina funcional conforme el plazo decenal del Artículo 1483, *supra*, sin que se derrotara la presunción de negligencia, y probado el incumplimiento contractual al no entregar una vivienda en condiciones habitables ni reparar oportunamente los defectos reclamados, resulta forzoso concluir que el contratista Colón Benítez incumplió su obligación contractual para con la señora Cortés Rivera. *No se cometieron los errores señalados.*

Finalmente, en el señalamiento (c) sostiene el matrimonio Colón Rivera erró el Tribunal de Primera Instancia al conceder daños morales sin que la señora Cortés Rivera presentara prueba al respecto. *No le asiste la razón.*

El matrimonio Colón Rivera señala que se concedió dicha cantidad en una ausencia total de prueba y que únicamente se basó en el testimonio de la señora Cortés Rivera. La prueba de daños desfilada durante la Vista del Juicio en su Fondo en el caso de epígrafe consistió en el testimonio de la señora Cortés Rivera. Veamos:

> **P:** ¿Usted está viviendo la casa actualmente?
> **R**: Solo voy a dormir.
> **P**: ¿Por qué?
> **R**: Porque dado el caso, yo no puedo usar el fregadero, no puedo usar los baños, solamente un baño.
> **P**: ¿Por qué no los puede usar?, Dígale al Tribunal.
> **R:** Porque tiene toda la tubería ro[t]a.[22]

---

[21] Transcripción de Juicio en su Fondo, testigo señor Benítez Colón, fecha 19 de diciembre de 2022, pág. 148, líneas 18-25; pág. 149, líneas 1-2; pág. 157, líneas 15-18; fecha 21 de diciembre de 2022, pág. 7, líneas 19-25; pág. 8, líneas 1-8; pág. 10, líneas 6-21; pág. 15, líneas 20-24; pág. 16, líneas 1-12; pág. 27, línea 3-23; pág. 28 línea 2-11.
[22] Transcripción de Juicio en su Fondo, fecha 17 de octubre de 2022, testigo Nilda Cortés Rivera, pág. 77 líneas 4-10.

En cuanto a los alegados daños emocionales, del testimonio se desprende lo siguiente:

> **P:** ¿Qué pasó luego?
> **R: Ahí pues el me dice… el viene, me dice a mí, me coge porque yo sí verdaderamente estaba en "shock" al ver mi casa destruida, el sueño de mi vida, eso infestado. (Deponente comienza a llorar).**
> **P.** ¿Necesita unos minutitos?
> **Lcdo. Núñez Ríos**: Vamos a pedir, Juez…
> **Honorable Juez:** No hay problema
> **Lcdo. Núñez Ríos: …**un receso para que pueda tomar agua…[23]

> .    .    .    .    .    .    .    .

> **P: Mire, ¿cómo si de alguna manera, le ha afectado esto a su vida?, dígale al Tribunal**
> **R: Me ha afectado mucho.**
> **P:** ¿Por qué?
> **R: No duermo, porque pensando nada más que… Cómo voy a estar bien si no puedo ni usar mi casa.** No puedo… si, si friego tengo que tenerlo en una olla para botar el agua afuera o echarla por "toilet" de un solo cuarto que tengo, porque lo demás no se puede usar.[24]

En adición, se desprende del testimonio de la pareja consensual de la señora Cortés Rivera, el señor Santiago López:

> **P: ¿Y cómo se siente doña Nilda cada vez que entra allí?**
> **R: Deprimida. Ella no quiere… Ella llega a la casa, pega [a] llorar.**
> **P**: Mire, y le pregunto…
> R: Adicional, que adicionalmente estamos pagando una hipoteca que no estamos viviendo casi y un sacrificio muy grande para nosotros, la casa única que tenemos y no podemos vivirla.[25]

El matrimonio Colón Rivera sostiene que no hubo un desfile de prueba documental. Empero, ante el foro sentenciador fue desfilado las alegaciones sobre los daños de la señora Cortés Rivera, la prueba testifical que fue evaluada y creída a satisfacción del Tribunal. En adición, el testimonio del señor Santiago López fortaleció lo expresado por el señor Cortés Rivera al confirmar que, están afectados por los vicios graves de construcción que amenazan su salud y bienestar desde hace más de diez (10) años.

---

[23] *Íd.,* pág. 80, líneas 6-17.
[24] *Íd.,* pág. 86, líneas 15-23.
[25] Transcripción de Juicio en su Fondo, fecha 17 de octubre de 2022, testigo Pedro Santiago López, pág. 142 líneas 4-12.

Sobre este particular, el Foro a *quo* incluyó en su *Comparecencia Especial* una explicación de los daños emocionales y angustias mentales concedidas. Veamos.

> En cuanto a la partida de daños emocionales y angustias mentales, luego de recibir el testimonio de la demandante Nilda Cortés Rivera, observar su "demeanor", el tribunal concluyó que esta ha sufrido y continúa experimentando sufrimientos, angustias mentales y daños morales como consecuencia de los daños a la Propiedad. El tribunal valoró los daños morales en $15,000.00. El razonamiento para la determinación de la cantidad otorgada de $15,000.00, es acorde con *Pereira v. I.B.E.C.,* 95 D.P.R. 28 (1967) donde se concedió una cantidad máxima de $2,500.00 por daños morales ocasionados como consecuencia del sufrimiento a un demandante por razón de vicios o defectos de construcción. Toda vez que el Índice de Precios al Consumidor fue 25.39 al año 1967, el poder adquisitivo del dólar era $3944 por lo que la cuantía otorgada en el precitado caso se ajusta a $9,850.005. Tornando la fecha de emitida la Sentencia en el presente caso, tenemos que el poder adquisitivo del dólar para febrero de 2023 era $0.75. Al actualizar la cuantía de $9,850.00 con el poder adquisitivo del dólar a febrero de 2023, tenemos una cuantía actualizada a $ 13,133.336. **Tomando en consideración los hechos particulares de este caso, en que la demandante Nilda Cortés Rivera continúa sufriendo de daños morales como consecuencia de los daños encontrados a su residencia principal, la cual sigue pagando sin disfrutar de ésta, el tribunal utilizando como base la cantidad calculada de $13,133.33, procedió a ajustar la cuantía otorgada a $15,000.00.**[26] (Énfasis suplido).

Aunque ha sido reiterado por el Tribunal Supremo de Puerto Rico que "los daños generales reclamados, al no constituir una suma líquida, tienen que probarse; no es suficiente con simplemente alegar que los daños montan o suman a la cantidad reclamada. Bajo cualesquiera circunstancias, la cuantía de los daños debe ser objeto de prueba". *Ruiz v. Col. San Agustín,* 152 DPR 226, 236 (2000); *Rivera v. Insular Wire Products Corp.,* 140 DPR 912, 932 (1996). Nuestro más alto Foro ha distinguido que en los casos contractuales, **"la reclamación por los daños procede cuando éstos son consecuencia exclusiva del incumplimiento con la**

---

[26] Comparecencia Especial, Hon. Juez Carlo Ríos, págs. 7-8.

**obligación contractual"**. *Ramos Lozada v. Orientalist Rattan Furniture, Inc., supra*, pág. 727. El Foro a *quo* sostuvo su determinación sobre la concesión de daños morales por incumplimiento contractual basado en el caso de *Pereira v. IBEC*, 95 DPR, 28, 29 (1967), donde se estableció que procede una reclamación de daños por incumplimiento contractual:

> "[...] aquellos casos en que las condiciones de la construcción hayan afectado en forma apreciable el estado emocional del reclamante. No todo vicio de construcción que dé derecho a que el constructor repare conlleva la concesión de daños morales. **Los vicios deben ser de tal naturaleza que afecten la condición anímica de una persona**".*Íd.* pág. 29. (Énfasis suplido).

Dicho raciocinio sobre la concesión de daños morales y angustias mentales el incumplimiento contractual ha sido reiterado por nuestro Tribunal Supremo a lo largo de su jurisprudencia interpretativa. *Cruz Cruz v. Casa Bella Corp., supra; Rivera Sanfeliz v. Jta. Dir. FirstBank*, supra, pág. 57; *Maderas Tratadas v. Sun Alliance, 185 DPR 880*, 909-910 (2012); *Muñiz-Olivari v. Stiefel Labs, supra*, pág. 820; *De Jesús v. Ponce Housing Corp.*, 104 DPR 885, 889 (1976). Es por ello que, no albergamos duda que, según surge del testimonio de la señora Cortés Rivera y del señor Santiago López, en efecto, la señora Cortés Rivera ha sufrido angustias durante este período de tiempo prolongado por más de diez (10) años a causa del incumplimiento contractual. El Tribunal de Primera Instancia concedió una partida de $15,000.00 a favor de la señora Cortés Rivera por concepto de sufrimientos, angustias mentales y daños morales.

Cónsono con lo resuelto por el foro sentenciador y nosotros, en nuestra función revisora, nos abstenemos de intervenir. Pues es sabido que, los tribunales apelativos no debemos intervenir con la valoración de daños que realiza el foro primario, salvo cuando la cuantía concedida resulte ridículamente baja o exageradamente alta. *Meléndez Vega v. El Vocero de PR, 189 DPR 123,* 203 (2013).

Toda vez que, "el foro primario es el que tiene contacto directo con la prueba testifical presentada y, por ende, está en mejor posición de emitir un juicio sobre la valorización de daños". *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 753 (2013). En el caso de autos, la prueba fue creída por el foro primario quien le otorgó el valor probatorio y le mereció entera credibilidad al testimonio de la señora Cortés Rivera sobre los daños morales, por lo que tomando en consideración la normativa aplicable y las determinaciones específicas consignadas por el juzgador de los hechos, concluimos que el Foro de Instancia adjudicó de forma razonable la valorización de los daños morales y angustias mentales en este caso. *No se cometió el error señalado.*

### -IV-

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, se confirma la *Sentencia* apelada en cuanto a los recursos consolidados KLAN202300282 y KLAN202300288.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

La juez Lebrón Nieves concurre sin opinión escrita.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones